Justin R. Kaufman
Rosalind B. Bienvenu
DURHAM, PITTARD & SPALDING, L.L.P.
505 Cerrillos Rd Suite A209
Santa Fe, New Mexico 87501
505.986.0600 phone
505.986.0632 fax
jkaufman@dpslawgroup.com
rbienvenu@dpslawgroup.com

Garrett D. Blanchfield (*pro hac vice forthcoming*)
Brant D. Penney (*pro hac vice forthcoming*)
Roberta A. Yard (*pro hac vice forthcoming*)
REINHARDT WENDORF & BLANCHFIELD
80 South 8th Street, Suite 900
Minneapolis, MN  55402
Tel:  (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| GARVIN PROMOTION GROUP, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and EXXON MOBIL CORPORATION f/k/a/ PIONEER NATURAL RESOURCES COMPANY,<br><br>Defendants. | Case No. _____<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiff, individually and on behalf of all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and/or other relief as appropriate, based on violations of the Sherman Act and numerous state antitrust, unfair competition, and consumer protection laws by Permian Resources Corp. f/k/a Centennial Resource Development ("Centennial"), Chesapeake Energy Corporation ("Chesapeake"), Continental Resources Inc. ("Continental"), Diamondback Energy, Inc. ("Diamondback"), EOG Resources, Inc. ("EOG"), Hess Corporation ("Hess"), Occidental Petroleum Corporation ("Occidental"), and Exxon Mobil Corporation ("Exxon"), which acquired Pioneer Natural Resources Company ("Pioneer") on May 3, 2024 (collectively "Defendants").

## NATURE OF THE ACTION

1.      Plaintiff brings this antitrust class action which alleges that Defendants conspired to coordinate, and ultimately, constrain, domestic shale oil production, which had the purpose and effect of fixing, raising, and maintaining the price of crude oil, and as a result, the price of Jet Fuel[1] in and throughout the United States.

2.      Shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.[2]  Shale oil is a high-quality type of crude oil found between layers certain types of rock formations.  It can be extracted by fracturing the rock formations that contain the layers of oil through a process known as hydraulic fracturing, or "fracking."  Fracking increased the volume and efficiencies in producing shale oil, leading to relatively lower prices.

---

[1] "Jet Fuel" is a is a kerosene-based product meeting the requirements of the applicable ASTM International specification (e.g., composition, volatility, fluidity, combustion, corrosion, thermal stability, contaminants, additives).  Jet Fuel is used in aircraft with turbine engines, including turboprops and jet engines.

[2] *How Much Shale (Tight) Oil is Produced in the United States?*, U.S. ENERGY INFO. ADMIN. (last updated Mar. 28, 2024) https://www.eia.gov/tools/faqs/faq.php?id=847&t=6.  Daily oil production is measured in barrels per day, which is referred to as bpd, b/d or B/D.  Production over longer periods is often measured in millions of barrels, abbreviated as MMbbl.

3.     Crude oil, including shale oil produced by Defendants, is sold to refineries which may combine it with crude oil extracted by older methods, such as drilling.  There is no material difference between crude oil obtained by fracking as opposed to drilling. The crude oil is refined jet fuel and other petroleum products.

4.     Crude oil is the primary input into jet fuel.   The price of crude oil is the main factor in establishing the cost paid by consumers of jet fuel.  A conspiracy to raise the price of crude oil is a conspiracy to raise the price of jet fuel. After it is refined, it is transported to storage terminals, from which it is further transported by truck, barge or pipeline to airports, and then into jets.

5.     Refineries purchase shale oil and other crude oil extracted from traditional drilling methods, co-mingle them, and then refine the oil into gasoline, diesel, and other petroleum-based products, including Jet Fuel.

6.     United States independent shale oil producers ("Independents") are companies that primarily focus on the exploration, development, and production of United States shale resources. These companies are distinct from large vertically integrated energy companies

7.     Independents traditionally acted as "swing producers" for the global crude oil market because of their ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.  Prior to the rise of the Independents, Saudi Arabia, as the largest member of OPEC, acted as the swing producer for the market.

8.     Independents business model is predicated upon acquiring and drilling shale wells.   These wells do not produce crude oil for as long as wells drilled using traditional methods.   Thus, the most successful Independents take competitive advantage of their ability to be more nimble than their OPEC counterparts

9.     Between at least 2017 and 2023, Defendants met and communicated regularly with each other, and with OPEC, to coordinate their collective oil output in response to market conditions.

10.     Following these meetings, Defendants consistently made public statements confirming the discussions and the exchange of confidential information.  Specifically, Defendants confirmed that they discussed production strategies, future investment plans, and price targets among and between themselves and OPEC

11.     OPEC made similar public statements regarding the cooperative nature of their developing relationship with Defendants. For example, following a panel in which OPEC Secretary General Mohammed Barkindo sat with Defendant Hess Oil's CEO John Hess, Secretary Barkindo wrote in an official OPEC bulletin: "*We have to continue to collaborate*. It's one industry. It's a global industry, and *I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views*" to which Hess responded, ""OPEC plays a very important role in stabilising the market and those efforts need to be recognised."[3]

12.     One United States shale executive – who asked to remain anonymous – bragged to Reuters about how, after meeting with OPEC and "having an open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry," United States shale oil producers "now have a seat at the table on [oil] pricing."[4]

13.     Prior to the COVID-19 pandemic, the prices and supply of crude oil remained relatively stable.  But the bottom of the market dropped out suddenly as the pandemic constrained travel, leading to a drop in pricing until early 2021, when both started to increase.

14.     The increase in the price of crude oil following the onset of the COVID-19 pandemic was driven, in part, by the Russian invasion of Ukraine in late February 2022, which led to sanctions that largely sequestered Russian oil from the global market.  This extended run of historically high crude oil prices created prime market conditions for Defendants, as rational

---

[3] Tom DiChristopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer group deserves praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html  (emphasis added).

[4] Alex Lawler and Ernest Scheyder, *OPEC to meet with U.S. shale firms in Houston on Monday*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa-idUSKCN1GB2KP/.

independent economic actors, to capture market share by taking advantage of their ability to quickly increase production in response to changes in the market.

15.     Instead, Defendants deviated from their historical practice and rational economic self-interest by restraining the production of shale oil. As a result, prices of crude oil – and subsequently, the prices of Jet Fuel, remained high.

16.     Defendants' agreement to refrain from increasing their shale oil production was part of a larger agreement between them and the Organization of the Petroleum Exporting Countries ("OPEC")—a cartel formed by the largest oil-producing nations, whose stated purpose is to manipulate global oil prices by coordinating production levels amongst its members.[5]

17.     On May 2, 2024, the United States Federal Trade Commission ("FTC") cleared a merger between Defendants Exxon and Pioneer, pursuant to a Consent Decree which would prohibit Exxon "from nominating, designating, or appointing  [Defendant Pioneer's CEO] Sheffield to the Exxon board or from serving in an advisory capacity in any way to the Exxon board or Exxon's management."[6]   The Consent Decree followed an FTC administrative complaint ("FTC Complaint") which was also released (in redacted form) on May 2, 2024.  The FTC Complaint is consistent with and supports the allegations in this Complaint regarding Defendants' efforts to constrain supply.

> Through public statements and private communications, Pioneer founder and former CEO Scott D. Sheffield has campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including the Organization of Petroleum Exporting Countries ("OPEC"), and a related cartel of other oil-producing countries known as OPEC+. Mr. Sheffield's communications were designed to pad Pioneer's bottom line—as well as those of oil

---

[5] Anshu Siripurapu & Andrew Chatzky, *OPEC in a Changing World*, CFR (Mar. 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.
[6] FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal (May 2, 2024) https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-order-bans-former-pioneer-ceo-exxon-board-seat-exxon-pioneer-deal.

companies in OPEC and OPEC+ member states—at the expense of U.S. households and businesses.[7]

The FTC Complaint details many of Sheffield's communications with United States shale oil producer and OPEC regarding limitations of production and supply of crude oil.

18.     The Complaint describes a "long-running strategy to coordinate output reductions" and further alleged that there is "voluminous evidence, including from [Pioneer's CEO]. Sheffield's own public statements, of his previous efforts to organize tacit (and potentially express) coordination of capital investment discipline and oil production levels in the Permian Basin and across the United States."[8]

19.     Defendants' agreement to limit their respective production of shale oil had the purpose and effect of fixing, stabilizing, and/or maintaining crude oil prices – and, in turn, Jet Fuel prices – at artificially inflated levels throughout the United States during the Class Period.

20.     Defendants' cartel is a *per se* unlawful restraint of trade under federal antitrust law and state antitrust, unfair competition, and consumer protection laws. Plaintiff and the members of the proposed Classes suffered substantial harm from the supracompetitive prices they paid for Jet Fuel as a direct and proximate result of Defendants' agreement to constrain shale oil production in the United States.  Plaintiff brings this suit to recover those losses and to enjoin Defendants' conduct to prevent Defendants from causing future harm.

## JURISDICTION, VENUE, AND COMMERCE

21.     This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), Section 16 of the Clayton Act (15 U.S.C. § 26), and antitrust, unfair competition, and consumer protection laws of various states. This action seeks compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

22.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

---

[7] In the Matter of Exxon Mobil Corp., Complaint at ¶ 1 (May 2, 2024)
https://www.ftc.gov/system/files/ftc_gov/pdf/2410004exxonpioneercomplaintredacted.pdf.
[8] Id. at ¶¶ 5, 22.

23.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs; there are more than 100 members in the proposed Classes, and Plaintiff is a resident of Arizona. Thus, at least one Plaintiff is a citizen of a state different from at least one of the Defendants, all of whom are either incorporated in Delaware or Oklahoma and headquartered in Oklahoma, Texas, or New York.

24.     This Court also has personal jurisdiction over all Defendants, and venue in this District is proper, under the combination of 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d). A substantial part of the events or omissions giving rise to the claims occurred in this District. Upon information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

25.     Defendants' activities were within the flow of and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

26.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and the Class members. Defendants, directly and through their agents, engaged in activities affecting all states.

27.     Defendants' conspiracy, wrongful anticompetitive conduct and resulting substantial anticompetitive effects described herein proximately caused injury to Plaintiff and members of the proposed Classes.

**PARTIES**

28.     Plaintiff Garvin Promotion Group, LLC is an Arizona limited liability company headquartered in Arizona with its principal place of business in Arizona.  Plaintiff purchased Jet Fuel at retail, and not for resale, indirectly from or more Defendants in multiple states, including Arizona, California, Colorado, Florida, Hawaii, Nevada, New Mexico, New York, Oregon,

Pennsylvania, and Utah during the Class Period and paid higher prices for those purchases as a result of the allegations herein.

29.     Defendant Permian Resources Corporation, known as Centennial Resource Development during the relevant period, is a Delaware Corporation headquartered in Midland, Texas. It was formed in 2022 in a transaction between Colgate Energy Partners III, LLC and Centennial Resource Development, Inc. Centennial's common stock is listed and traded on the New York Stock Exchange under the trading symbol PR. Centennial is an oil and gas production company that acquires and processes shale oil largely in Texas and New Mexico, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

30.     Defendant Chesapeake Energy Corporation is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. Chesapeake's common stock and warrants to purchase common stock trade on the Nasdaq Stock Market under the trading symbols CHK, CHKEW, CHKEZ, and CHKEL. Chesapeake is an oil and gas production company that acquires and processes shale oil largely in Louisiana and Pennsylvania, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

31.     Defendant Continental Resources Inc. is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm, on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc. Continental is an oil and gas company that acquires and processes shale oil largely in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

32.     Defendant Diamondback Energy, Inc. is a Delaware Corporation headquartered in Midland, Texas. Diamondback's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol FANG. Diamondback is an oil and gas production company that

acquires and processes shale oil in Texas, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

33.     Defendant EOG Resources, Inc. is a Delaware Corporation headquartered in Houston, Texas. EOG's common stock is listed and traded on the New York Stock Exchange under the trading symbol EOG. EOG is an oil and gas production company that acquires and processes shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

34.     Defendant Hess Corporation is a Delaware Corporation headquartered in New York, New York. Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES. Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country. Hess also sells the refined consumer Jet Fuel across the United States.

35.     Defendant Occidental Petroleum Corporation is a Delaware Corporation headquartered in Houston, Texas. Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively. Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

36.     Defendant Pioneer Natural Resources Company is a Delaware Corporation headquartered in Irving, Texas.  Pioneer was acquired by Defendant Exxon in May, 2024. Pioneer is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

37.     The term "Defendants," as used herein, refers to and includes each of the named Defendants as well as each Defendant's predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

38.     Where Plaintiff attribute an action to "Defendants," unless otherwise stated, that action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer.

## AGENTS AND CO-CONSPIRATORS

39.     Various co-conspirators, known and unknown, willingly participated in and acted in furtherance of the alleged conspiracy.

40.     Each Defendant was a co-conspirator with each of the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

41.     Defendants are liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

42.     At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of shale oil production and crude oil prices.

43.     Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## FACTUAL ALLEGATIONS

**A.     OPEC's Historical Control over the Price of Crude Oil.**

44.     OPEC is an intergovernmental organization made up of twelve oil-exporting countries[9] who purport to benefit from sovereign immunity to the Sherman Act.[10] OPEC and its member countries control nearly 40% of the world's oil production[11] and 80% of its proven current oil reserves.[12]



---

[9] Algeria, Congo, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Saudi Arabia, United Arab Emirates, and Venezuela. *About Us*, OPEC, https://www.opec.org/opec_web/en/about_us/25.htm.

[10] Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, IAEE ENERGY FORUM, Vol. 28, ISSN 1944-3188 (Feb. 2019), https://www.iaee.org/documents/2019EnergyForum1qtr.pdf, at 17 (OPEC's stated mission is to "'coordinate and unify the oil policies of its member countries and ensure the stabilization of oil markets . . . .' The organization is also a significant provider of information about the international oil market.").

[11] *What Drives Crude Oil Prices?*, U.S. ENERGY INFO. ADMIN, https://www.eia.gov/finance/markets/crudeoil/supply-opec.php.

[12] *OPEC Shares of Crude Oil Reserves 2022*, OPEC https://www.opec.org/opec_web/en/data_graphs/330.htm.

45.     For decades, OPEC exerted market power over global oil prices by coordinating its members' respective production levels.[13] Non-member oil-producing nations generally followed OPEC's coordinated production levels, generating additional revenue from their production of oil.

46.     Saudi Arabia has generally had the largest production capacity and maintained the largest margin of excess capacity, and also has the lowest marginal costs to produce oil. Therefore, Saudi Arabia acted as both the *de facto* head of OPEC and OPEC's swing producer,[14] quickly adjusting production levels in response to changing market conditions.[15]

**B.     Fracking Leads to a "New Oil Order."**

47.     In the early 2000s, the oil industry was revolutionized by technological innovations in horizontal drilling and fracking, which made it economically viable to substantially increase output from shale and other tight rock formations.[16]

48.     As a result of increased fracking, between 2008 and 2015, the United States experienced the "Shale Revolution," the fastest increase in crude oil production capacity in history, which reversed a decades-long trend of declining United States crude oil production.[17]

49.     Fracking allowed oil producers to be far more nimble.   Wells drilled by fracking require relatively small capital commitments and can be brought online within months, instead of years.

50.     The supermajor oil producers, on the other hand, can change course about as swiftly as one of their oil tankers.  Supermajors typically invest in decades-long traditional drilling projects that require substantial lead time and infrastructure construction before production.

---

[13] Siripurapu & Chatzky, *supra* note 5.

[14] *Salameh supra* note 10.

[15] *Oil Market Report - January 2024*, INT'L. ENERGY AGENCY, https://www.iea.org/reports/oil-market-report-january-2024#.

[16] John Kemp, *Is the U.S. shale oil revolution over?*, REUTERS (Nov. 23, 2022), https://www.reuters.com/markets/commodities/is-us-shale-oil-revolution-over-kemp-2022-11-22/.

[17] Id.

51.     Thus, production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors. According to market analysts, "the shale sector's ability to boost production – and to scale back – relatively quickly is its calling card,"[18] which makes United States shale oil, "as close to inventory-on-demand as oil ever comes."[19]

52.     Production of United States shale oil production posed a significant problem for OPEC. But OPEC had a significant advantage derived from their members' status as nation-states: they were purportedly protected against the United States' antitrust laws through their sovereign immunity.

53.     The Independents are not sovereign nation-states and are not immune from the Sherman Act. This means that while United States shale producers would come to produce as much oil as the largest OPEC and OPEC+ nations,[20] they could not coordinate production levels and prices like the OPEC cartel. Instead, Independents were forced to compete with one another, resulting in lower prices for crude oil and its derivative products, including Jet Fuel.

54.     The increase in domestic shale oil production began to undercut OPEC's artificially inflated prices and usurp the Saudi swing producer role,[21] setting the battle lines for the OPEC Price War.

---

[18] Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war.

[19] Steve LeVine, *Oil Hasn't Bottomed out, so Trade Now at Your Own Peril*, QUARTZ (Feb. 10, 2015), https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

[20] Devin Krishna Kumar, U.S. expected to end 2018 as world's top oil producer: EIA, REUTERS (Dec. 11, 2018), https://www.reuters.com/article/us-usa-oil-eia-outlook/u-s-expectedto-end-2018-as-worlds-top-oil-producer-eia-idUSKBN1OA21D.

[21] Hailey Lee, *Why OPEC's Losing Its Ability to Set Oil Prices*, CNBC (Oct. 27, 2014), https://www.cnbc.com/2014/10/27/us-shale-replaces-opec-as-leading-swing-producer-goldman.html (The United States has nearly four times the spare capacity in shale oil compared to Saudi Arabia); David Livingston & Eugene Tan, *Shale's True Contribution to the Oil Market*, CARNEGIE ENDOWMENT FOR INT'L PEACE (July 9, 2015), https://carnegieendowment.org/2015/07/09/shale-s-true-contribution-to-oil-market-pub-60659

55.    In fact, in 2014, Defendant Continental's CEO Howard Hamm referred to OPEC as a "toothless tiger"[22] and he predicted that shale oil drillers would come together as more of a collective, and named this collective "Cowboyistan,"[23] and noting "how cohesive we [shale oil drillers] have been in this downturn." [24]   The industry can stop in response to price signals.

**C.    2014-2016: The "OPEC Price War."**

56.    The economies of OPEC member-nations are heavily dependent upon crude oil process.    OPEC realized that Cowboyistan was a viable threat to OPEC's business model. However, the members of OPEC and its member nations were not going to cede the pricing power that OPEC had held for a half-century to United States shale producers without a fight.

57.    OPEC sought to leverage its ability to cheaply produce oil to force the United States shale oil, which was more expensive to produce, out of the market.   Accordingly, despite a global oversupply of crude oil in mid-2014, OPEC made a deliberate decision to maintain its production levels to win back the market share it had lost to Independents and to push oil prices to a level that would render United States shale oil no longer economically viable.[25]   This was the opening salvo in a two-year period of open global competition, dubbed within the industry as the "OPEC Price War."

58.    The price of crude oil plummeted, as OPEC member nations *and* United States shale oil producers produced crude oil at levels not seen in decades.

---

[22] Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS via YAHOO! NEWS (June 18, 2018), https://www.yahoo.com/news/continental-resources-ceo-harold-hamm-162200046.html.

[23] Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan of U.S> Domination of Global Oil,* FORBES (March 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/.
[24] Id.
[25] Siripurapu & Chatzky, *supra* note 5; Javier Blas, *Wall Street is Finally Going to Make Money Off the Permian*, BLOOMBERG (Apr. 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off (In February 2016, Saudi Arabia's Oil Minister Al-Naimi cautioned U.S. shale producers to "[l]ower costs, borrow cash, or liquidate.").

**Figure 1. Daily Crude Oil Spot Prices (2010-2016)**



Source: U.S. Energy Information Administration, based on Thompson Reuters

59.    The prices for Jet Fuel, which follows the price of crude oil also plummeted during this period.

**Figure 2. Jet Fuel Prices (2010 – 2016)**



## U.S. Kerosene-Type Jet Fuel Retail Sales by Refiners

Dollars per Gallon

— U.S. Kerosene-Type Jet Fuel Retail Sales by Refiners

eia  Data source: U.S. Energy Information Administration

60.     During the OPEC Price War, the technological advancements and accumulating experience in the shale oil industry led to decreases in the breakeven points,[26] allowing Independents to exploit less productive shale "plays" profitably.[27]

61.     Despite OPEC's long-standing resistance to expansion,[28] OPEC responded to the suddenly-changing marketplace by significantly expanding the size of its cartel, adding 10 non-

---

[26] *See, e.g.,* Maitham A. Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 (July 2023), https://econjournals.com/index.php/ijeep/article/view/14455 ("This continuous decrease in the break-even price of shale oil made the US shale oil industry more flexible to face fluctuations in oil prices" and "[d]espite the drop in prices from about $100 a barrel in 2014 to $64 a barrel in 2019, shale oil production has doubled by 100% during this period.").

[27] A "play" is composed of proved and probably gas and oil reserves that exhibit similar geological characteristics. https://naturalgasintel.com/questions/what-is-a-shale-play/

[28] Guy Laron, *The OPEC+ Puzzle: Why Russian-Saudi Cooperation Starts – and Stops – with Oil Prices*, THE WILSON CENTER (Jan. 19, 2023), https://www.wilsoncenter.org/article/opec-puzzle-why-russian-

member oil-producing nations including Russia, whose production rivaled that of Saudi Arabia. This expansion, now known as "OPEC+,"[29] increased OPEC+'s market share to nearly 60%.

62.     Thus, while Defendants remained competitive in the lower-price environment by cutting costs and focusing on the most productive shale oil plays, United States shale oil producers were able to continue drilling at consistent levels despite the price drop caused by the OPEC Price War.[30]

63.     Though the OPEC Price War lasted years, OPEC was unable to drive the United States shale oil industry out of the business, though smaller Independents began to fail or were forced to merge to survive.[31] Conversely, this only served to create better conditions for the fewer remaining Independents, like Defendants, to organize themselves to combat OPEC.

---

saudi-cooperation-starts-and-stops-oil-prices (Despite decades of tension and bad blood between Russia and Saudi Arabia, "[t]here was no way for OPEC to deal with the growing market power of the US without cooperating with the Russians."); *see also* Harry First & Darren Bush, *The U.S. Can Take on the Oil Cartel that Enables Putin, and Win*, THE N.Y. TIMES (June 3, 2022), https://www.nytimes.com/2022/06/03/opinion/gas-prices-russia-opec.html (Antitrust specialists have concluded that "as more countries joined or allied themselves with the [OPEC] cartel, it has only become more effective at controlling the output of what would otherwise have been competing oil producers.").

[29] Salameh, *supra* note 10 at 18 (In 2017, "Saudi Arabia was forced to eventually discard its [price war with U.S. Independents] strategy and engineer with Russia an OPEC/non-OPEC production cut agreement" in an attempt to regain control of crude oil prices. The agreement was extended through 2018 and converted into a "permanent mechanism for cooperation between OPEC and Russia in what has been dubbed as OPEC+."). Throughout this Complaint, references to OPEC from December 2016 onwards encompass OPEC+.

[30] Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production).

[31] Matt Egan, *OPEC tried to put this US shale oil driller out of business. It 'backfired'*, CNN BUSINESS (May 12, 2017), https://money.cnn.com/2017/05/12/investing/shale-oil-ceo-opec/index.html.

**D.    Coordination Between OPEC and Cowboyistan Gives Defendants a "Seat at the Table on Pricing."**

64.    The OPEC Price War was a war of attrition, exacting steep tolls from both sides. Having failed to drive United States shale oil producers out of the market,[32] OPEC decided to pursue a different strategy.

65.    First, OPEC added 10 non-OPEC oil producing nations to form OPEC+ in 2016, further consolidating non-US producers and increasing the cartel's share of the global market.

66.    United States shale oil producers were also weary from the OPEC Price War and therefore open to the idea of joining the cartel, signaling their willingness through public means. "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[33] Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to [the] slide in crude oil prices."[34]

67.    OPEC received Hamm's signal that Continental and the other Defendants were willing to play ball. Beginning at least as early as 2017, Defendants began meeting regularly with members of OPEC, including at industry events.[35]

---

[32] Mufson, *supra* note 30 (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices. But its success has been slow, limited and remains fragile. And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

[33] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

[34] *Id.*

[35] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10 (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

68.     Many of these meetings took place during the CERAWeek Conference.[36] CERAWeek "is widely considered to be the most prestigious annual gathering of CEOs and Ministers from global energy and utilities"[37] and is held annually in Houston, Texas.

69.     **2017.** For example, during 2017 CERAWeek Conference ("CERAWeek 2017"), OPEC's then-General Secretary Mohammed Barkindo "dined with about two dozen U.S. shale executives," including Pioneer's Scott Sheffield, Hess's John Hess, and Chesapeake's Robert Douglas Lawler.[38] Sheffield stated at that time, "OPEC had purportedly never before met with United States shale producers,[39] leading reporters to describe the meeting as "unusual."[40]

70.     The meeting between United States shale oil producer and OPEC during CERAWeek 2017 "opened a communication channel."[41]

71.     This new communication channel did not go unnoticed by Defendants. Pioneer's Scott Sheffield stated, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US [I]ndependents than I have seen over my entire career."[42]

72.     Sheffield also attended what was described as a "Dinner Détente" at CERAWeek 2017, after which he said "[OPEC's] trying to understand our business model" and "I think

---

[36] Dan Yergin and James Rosenfield founded Cambridge Energy Research Associates (CERA) (see https://ceraweek.com/about/index.html), which became known for its annual conference in Houston, Texas, focusing on the energy sector's future. Over time, this event grew into CERAWeek, a five-day event offering speaking sessions and networking opportunities for attendees.

[37] See https://ceraweek.com/about/ (last visited August 16, 2024).

[38] Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says*, BLOOMBERG, (Mar. 7, 2017). https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts?embedded-checkout=true#xj4y7vzkg.

they're trying to understand more about our ability to produce, what the cost structure is and what's going to happen over the next several years."[43] Sheffield concluded, "[i]n return, shale producers are talking with OPEC to learn about the members' thought process towards the price of oil over the next several years, what supplies the different members have themselves, and whether inventories are falling."[44] According to Sheffield, "[this] helps us plan long term."[45]

73.     These meetings were not limited to group meetings.  OPEC's Secretary General also held "bi-lateral" meetings with shale executives to "garner views and opinions from other senior oil industry executives" during CERAWeek 2017, according to Defendant Hess's CEO John Hess.[46] Following a dinner with OPEC officials, Hess said "It was a very good exchange of information and views about oil . . . I really commend the OPEC Secretary General for outreach. It was a good talk."[47] OPEC Secretary General Barkindo confirmed that everyone was on the same page regarding the need to collectively work to achieve price stability following the 2017 meetings, because "no-one wants to see a repeat of 2015 and 2016."[48]

74.     During CERAWeek 2017, OPEC and United States shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet.[49]

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *CERAWeek 2017: Encouragement & engagement*, 47 OPEC BULLETIN 2, (Mar./Apr. 2017),        https://docplayer.net/55519391-Vienna-austria-save-the-date-june-hofburg-palace-vienna-austria.html, at 16.

[47] Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[48] OPEC BULLETIN, *supra* note 46, at 15.

[49] Blas, *supra* note 47.

75.     As the participants of this meeting readily acknowledged, United States shale oil producers – including some, if not all, of the Defendants – not only shared competitively sensitive, forward-looking information concerning both production levels and pricing with OPEC, but they expressly agreed to reduce crude oil supplies.

76.     Following the CERAWeek 2017 meetings, Saudi Arabia's Energy Minister Khalid Al-Falih warned United States shale producers that if they wanted to collaborate they would have to pull their own weight.  There would be no "free rides" on OPEC production cuts.[50]

77.     Later in 2017, OPEC Secretary General Barkindo said that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[51] Barkindo said after a meeting with executives of Defendants Hess and Continental at CERAWeek 2017, he believed that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[52]

78.     **2018.**  Prior to CERAWeek 2018, Barkindo explained he would again meet with United Staes shale executives.  "It's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[53]

79.     Barkindo stated said that OPEC and the United States shale industry had agreed at their 2017 meeting that they had a "shared responsibility" towards the oil markets,[54] and the CERAWeek 2018 meeting was intended to "further explore the mechanics of achieving our common objective" of stable production volumes and prices.[55]

---

[50] Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, REUTERS (Mar. 9, 2017), https://www.reuters.com/article/idUSKBN16G2TQ/.

[51] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[52] *Id.*

[53] Blas & Smith, *supra* note 38.

[54] *Id.*

[55] *Id.*

80.     At the CERAWeek 2018 dinner meeting OPEC officials met with United States shale executives, Secretary General Barkindo gave a speech that Defendant Pioneer's CEO considered as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth."[56] The OPEC representative from Equatorial Guinea said that "[t]he key thing is that information is share about our projections; it really helps everybody.... The important thing is to know how much they [shale] are investing, and their projections because usually they have good statistics.... What we are doing is avoiding volatility." Defendant Centennial's CEO Mark Papa described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[57]

81.     OPEC representatives described the meeting between OPEC and United States shale executives similarly, with the key takeaway being a shared commitment to exchange confidential production information.  "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics."[58] Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, acknowledged that the goal was to affect the forces that determine pricing in a competitive market: "[w]hat we are doing is avoiding volatility."

82.     Other OPEC representatives stated that United States shale producers had to "take some responsibilities in terms of stability of oil prices."[59]

---

[56] Ernest Scheyder & Ron Bousso, *U.S. shale and OPEC share steakT in uneasy truce at Houston dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/us-ceraweek-energy-opec-shale-idUSKCN1GJ04H/.

[57] *Id.*

[58] *Id.*

[59] Ernest Scheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energy-

83.     Secretary General Barkindo summed up the March 2018 meeting: OPEC and the United States shale executives "had a very open, frank and lively conversations [sic] on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[60] Barkindo also explained that OPEC and Defendants "compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious."[61]

84.     One anonymous chief executive of a United States shale producer crowed that Cowboyistan had earned a seat at OPEC's "table on pricing."[62]

85.     The tone between OPEC and the United States shale producers continued to warm. Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, Hamm "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."[63]

86.     Following the CERAWeek 2018 dinner, Secretary General Barkindo invited United States shale executives to attend an OPEC International Seminar in June 2018 ("June 2018 OPEC Seminar").[64] At least two of the Defendants' executives, Scott Sheffield (Pioneer) and John Hess (Hess), attended the June 2018 OPEC Seminar, during which Sheffield stated, "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel]

---

nigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stable-idINKBN1GH347/.

[60] *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51.

[61] Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

[62] Lawler & Scheyder, *supra* note 4.

[63]  Scheyder, *supra* note 22.

[64] Domm, *supra* note 61.

oil, that's too high.. There's a sweet spot between $60 and $80."[65] Sheffield urged, "OPEC needs to fulfill its duty."[66]   A reporter noted that "Sheffield will not be part of OPEC's production negotiations on Friday, but his comments are likely to play into the group's discussions.... That Sheffield even came to the OPEC event surprised some market observers.  U.S. antitrust law prohibits U.S. producers from making any output agreement or from working with OPEC members."[67]

87.    Sheffield's signaling on production and pricing contradicts the historical practices of Defendants to seek higher price levels to support their racing to drill more wells and increase market share.

88.    Sheffield continued to signal OPEC, speaking in June 2018 to an OPEC panel in Vienna, Austria about OPEC's and Defendant' crude oil supplies and pressuring OPEC to increase production.  "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference. . .. If they don't we are going to see $100 oil or higher."[68]  Again, these statements, urging competitors to increase production, are a departure from historical practice.

89.    Sheffield's signaling appeared to have prompted a specific response from OPEC, as. Sheffield accurately predicted the exact amount of OPEC's production change two days in advance of OPEC's June 22, 2018 production negotiation.[69]

---

[65] Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/idUSKBN1JG2OA/.

[66] *Id.*

[67] *Id.*

[68] *Pioneer Chairman Sees an OPEC Increase of up to 600,000 B/D*, (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[69] Compare *id.* (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million . . . and that will phase in over the next few months.") with Rania El Gamal, et al., OPEC agrees modest hike in oil supply after Saudi and Iran compromise, REUTERS (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in

90.     **2019.**  Defendants and OPEC continued to have direct communications about the United States shale oil market in 2019.  For example, in January 2019 at the Davos World Economic Forum, John Hess, CEO of Defendant Hess and Vicki Hollub, CEO of Defendant Occidental, while sitting on a panel containing OPEC's Secretary General Barkindo and Dan Yergin, Vice Chairman of IHS Markit (a company that provides market analysis services to OPEC members).[70]  both "said that growth of U.S. shale oil output would slow" [71] in the near future

91.     At Davos, Secretary General Barkindo said OPEC wanted even more regular communication with United States shale oil producers  "to understand their industry better even if they could not participate in any OPEC-led production cuts."[72]   Hess, in turn, praised Barkindo's comments and acknowledged that "the Secretary General of OPEC, as well as OPEC Members, play a very important role in stabilising markets for oil, so those efforts are to be recognized."[73]  Barkindo responded by supporting the developing relationship between OPEC and the United States shale oil producers: "We have to continue to collaborate. It is one industry. It is a global industry, and I think our colleagues in the US are on the same page with us and we will work together to exchange views."[74]

92.     Barkindo also highlighted the importance of OPEC+ in helping stabilize the oil market years following the OPEC Price War.[75]

---

production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]").

[70] IHS performs market analyses on behalf of OPEC member nations.

[71] Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS (Jan. 23, 2019), https://www.reuters.com/article/idUSKCN1PH1UX/.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] DiChristopher, *supra* note 3

93.     In early 2019, OPEC+ began new production cuts.[76] Reuters reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[77]

94.     In advance of his now-annual meeting with United States shale executives at CERAWeek 2019, Barkindo again acknowledged the deepening relationship between OPEC and the United States shale industry: "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers.... It is essential we continue the conversation with [the] U.S. shale industry." [78]

95.     United States shale executives again met with OPEC members in March during CERAWeek 2019.[79]   Bloomberg reported that CERAWeek "has become an informal communication channel between the cartel and fast-growing shale producers."[80]

96.     Barkindo reported that a CERAWeek dinner attended by Defendant CEOs John Hess (Hess), Vicki Hollub (Occidental), Mark Papa (Centennial), and Travis Stice (Diamondback), included a "friendly conversation on current industry issues and the immediate prospects and challenges for all."[81]

---

[76] Alex Lawler, *OPEC posts first 2019 oil-output rise despite Saudi cuts*, REUTERS (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

[77] Jennifer Hiller, *U.S. shale producers see OPEC pullback helping 2019 profits*, REUTERS (Dec. 8, 2018), https://www.reuters.com/article/idUSL1N1YC20I.

[78] Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-withshale-competitors-for-third-year-1.1227226.

[79] *Id.*
[80] *Id.*

[81] Javier Blas & Rachel Adams-Heard, *OPEC Splits Avocado Appetizer with Shale Adversaries in Texas*, BLOOMBERG (Mar. 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year.

97.     Diamondback CEO Stice emphasized that a CERAWeek meeting between OPEC and Defendants, featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[82]

98.     At an interview with CNBC during CERAWeek 2019, Barkindo also indicated that OPEC and its allies will continue supply adjustments through 2019 but that no one country could serve as a swing producer; "we need to swing collectively."[83]

**E.     Defendants Agree to Cut Production of Shale Oil.**

99.     Defendant's developing relationship with OPEC resulted in increased communications and information exchanges, but it is not known exactly when Defendants began coordinating their output with OPEC. At least through the end of 2018, it appeared that Defendants were not yet ready to slow their growth and cut back production as shown in Figure 3) but it is not clear whether this is because OPEC allowed the United States shale oil producers some room to expand, or whether the U.S. shale oil producers were taking a hard line.  But it is clear that industry analysts expected the US shale oil production to expand.  It didn't.

---

[82] Blas & Adams-Heard, *supra* note 81.

[83] *OPEC Secretary General on Saudi Arabia's oil production, Venezuela and NOPEC*, CNBC (Mar. 12, 2019), https://www.cnbc.com/video/2019/03/12/opec-secretary-general-on-saudi-arabias-oil-production-venezuela.html.

**Figure 3. Change in Crude-Oil Production – United States Shale Oil v. OPEC (2014 – 2019)**[84]



100.    Analysts took note, predicting a "second wave of the U.S. Shale revolution," would begin in 2019 and would increase U.S. oil output by "1.4 million barrels a day this year, to average 12.4 million barrels a day," which would be "concerning" for OPEC.[85]

101.    However, the COVID-19 pandemic suddenly and drastically decreased demand for crude oil.[86] As a result, OPEC made emergency cuts to production to stabilize pricing, and the United States shale oil industry consolidated, leaving the large Independents with increased market share while some smaller Independents went bankrupt.[87]

---

[84] Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET JOURNAL (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826.

[85] *Id.*

[86] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[87] Irina Slav, *Shale Executives See Little Chance of Significant Growth*, OILPRICE.COM via BUSINESS INSIDER (Dec. 6, 2020), https://markets.businessinsider.com/news/stocks/shale-executives-see-little-chance-of-significant-growth-1029867633.

102.     This economic upheaval provided additional motives for Defendants and OPEC to end the price war and collaborate on their respective production levels, and consequently, global crude oil prices.

103.     Thus, in July 2020, OPEC's Secretary General made it clear that OPEC and Defendants could sustain high crude prices if everyone played their role:

> We were able to reach out to the U.S. [I]ndependents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. . . Everybody has a role to play. . . . We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.[88]

104.     Months later, Defendant EOG's CEO Bill Thomas confirmed Defendants' willingness not to increase production in response to OPEC's raising oil prices: "In the future, certainly we believe OPEC will be the swing producer – really, totally in control of oil prices. . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[89]

105.     As the pandemic began to recede, demand for crude oil increased, driving the price to nearly $70 a barrel by March 2021.[90] But even as demand increased and prices continued to rise, OPEC continued to restrain production, driving prices to even greater heights.[91]

106.     Defendants bucked their historical practice of increasing production and instead suddenly and nearly in unison exercised supply "discipline" for the first time in the history of

---

[88] *OPEC Secretary General: No objective to drive US shale out of business*, OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretarygeneral-no-objective-to-drive-us-shale-out-of-business.

[89] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands..

[90] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[91] *Id.*

United States shale production. Defendants regularly and repeatedly signaled to each other and OPEC that they would no longer compete for market share or act as swing producers:

- **February 2021**. Defendant Chesapeake's CEO Doug Lawler announced that United States shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[92] Defendant Pioneer's CEO Scott Sheffield agreed, predicting that small companies would increase output but in the aggregate United States output would remain flat, even if crude prices go above $60, as the large United States Independents would jointly practice discipline.[93]

- **March 2021**. OPEC announced supply restrictions and on the same day, Defendant Occidental's CEO Vicki Hollub said that despite a "healthier supply and demand environment," United States oil production would not return to pre-pandemic heights because Defendants and other United States shale producers were "committed to value growth, rather than production growth."[94]

- **April 2021**. Defendant Pioneer's CEO Sheffield stated that Pioneer and other United States shale producers would not meet rising prices by increasing supply.[95] "OPEC and Russian were upset that grew too much. .... If we ever start growing too much again, we're going to have another price

[92] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/

[93] *Id.*

[94] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html.

[95] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

war."[96]   Sheffield also warned United States shale producers that they risked starting another price war with OPEC if they resumed the historical, rapid production growth of the last decade.   Sheffield also stated shale producers would "stick to their mantra of capital discipline" even though the United States government had predicted an increase in production of shale oil.[97]

- **June 2021.** Sheffield stated he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns,"[98] and that the even though smaller producers have added more rigs, that was not likely to "drive up volumes enough to ruffle OPEC+ producers."[99]

- **August 2021.** During an earnings call, EOG's President and CEO Bill Thomas continued the Defendants' recent refrain of a "new era" of collaboration.   "I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."[100]

- **October 2021**. Defendant Pioneer's CEO Sheffield stated that United States producers were not willing to increase supply to curb soaring crude oil

---

[96]. *Id.*

[97] *Id.*

[98] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

[99] *Id.*

[100] EOG Resources (EOG), *Q2 2021 Earnings Call Tr.*, THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

prices that were "under OPEC control,"[101] reflecting Defendants' production restraint agreement. Sheffield reaffirmed Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year no matter how the price of crude oil moved, explaining "everybody's going to be disciplined...."

107.   Defendants' change in historical business practices from "Cowboyistan" to production restraint surprised oil industry analysts, especially given that Defendants' breakeven prices at the time were around $40/barrel,[102]:

- **January 2021**. Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles" and that the recent "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[103]

- **June 2021.** A Reuters columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel,"[104] and that 2021's "run up in crude prices, and oil

---

[101] Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

[102]   EOG   Resources,   *Value   Matters:   4Q   2021   Presentation*,   (2022), https://s24.q4cdn.com/589393778/files/doc_financials/2021/q4/EOG_0222.pdf   (Defendant EOG's price needed to secure 10% return on capital, not breakeven, was approximately $40.); Occidental Petroleum Corp., *Q3 2020 Earnings Call Tr.*, OXY.COM (Nov. 10, 2020), https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/OXY3Q20Transcript.pdf (Defendant Occidental's breakeven price was approximately $40.); Diamondback   Energy,   Investor   Presentation   (Nov.   2021),   at   Slide   11, https://www.diamondbackenergy.com/static-files/532c60b3-f8f0-4f43-8368-91b9f4b628e2 (Defendant Diamondback Energy's 2021 breakeven price was "approximately $32 per barrel.")

[103]Hampton, *supra* note 98.

[104] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom [by U.S. shale producers]."[105] However, Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. . . . Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[106]

- **February 2022.** On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new strategy, telling Chesapeake's CEO that the company's plans to slow production would be "the easiest way to destroy value" for the company in the long term.[107]

108.    OPEC understood the significance of the United States' shale producers' change to their historical business practices.  In early 2021, anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[108]  OPEC's Secretary General Barkindo signaled that the Price War was over, telling Reuters that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market," and Independents and OPEC "have a shared responsibility in this regard."[109]

### F.  Defendants' Coordination with OPEC Continues and Expands in 2022-23.

109.    Defendants and OPEC continued meeting and communicating throughout 2022 , even as OPEC+ member Russia launched an invasion of Ukraine.  That invasion of Ukraine led

---

[105] Hampton, *supra* note 98.

[106] Kemp, *supra*  note 104.

[107] Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results - Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nickdellosso-on-q4-2021-results-earnings-call

[108] Lawler & Hiller, *supra* note 92

[109] *Id.*

to a decrease in the supply of oil available in the United States market, due to both an unanticipated significant strain on supply chains and the separation of Russia's oil production from the world market.

110.    Within a few weeks after the start of the invasion, Defendants met with OPEC officials at CERAWeek 2022 for "at least the fourth time since 2017 .... to discuss energy concerns."[110] Again, Defendants and OPEC "gathered in a private room at a restaurant."[111]

111.    As Reuters noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[112]

112.    On January 5, 2023, Defendant Pioneer's CEO Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to chang .... If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut... [W]e'll see what happens in the next 90 days."[113]

113.    Less than three months later, OPEC "shocked traders around the world"[114] when it announced a "surprise" production cut, despite the fact that OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[115]

114.    Between Sheffield's prediction and OPEC's announcement, on March 27, 2023, some Defendants, including at least Pioneer and EOG, had pulled back the hedge positions they

---

[110] Liz Hampton & Arathy Somasekhar, *OPEC Meets with U.S. Shale Executives as Oil Prices Skyrocket*, REUTERS (Mar. 7, 2022), https://www.reuters.com/business/opec-meet-with-us-shale-executives-us-energy-conference-oil-prices-skyrocket-2022-03-08/.

[111] *Id.*

[112] Hampton, *supra* note 35.

[113] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut

[114] *Id.*

[115] Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

had previously established to protect against downward oil price movements[116] and leaving Defendants "suddenly vulnerable" to massive economic risk if oil prices went down.[117] Sheffield defended the extraordinarily risky move, stating "we're not going to hedge."

115.    Less than one week later, OPEC announced a "surprise" production cut, slashing 1.15 million barrels of oil production per day.[118] The only plausible explanation for Defendants' failure to hedge was their advanced knowledge of OPEC's planned production cuts.

116.    Earlier, in March, 2023, the Financial Times reported that OPEC Secretary General-elect Haitham Al Ghais met with United States shale executives, including at least Defendant Pioneer's Sheffield, Defendant Chesapeake's Dell'Osso, Defendant Diamondback's Stice, Defendant Occidental's Hollub, and Defendant Hess's John Hess, [119] "in a downtown Houston steakhouse" to reaffirm their agreement to restrict production "[d]espite recent record profits."[120] One person who attended the dinner reported that "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year - a range between 400,000 and 600,000 b/d, according to one person at the dinner."[121]

---

[116] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

[117] *Id.*

[118] Reuters, *supra* note 115.

[119] In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor. Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he passed away. According to the New York Times, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces." Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html.

[120] Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[121] *Id.*

117.    In the same article, Sheffield reaffirmed his support of OPEC: "I think the people that are in charge now are three countries - and they'll be in charge the next 25 years. . . . Saudi first, UAE second, Kuwait third."[122]

### G. Defendants' Actions are Economically Irrational and Inconsistent with Prior Business Practices.

118.    Defendants used different terms and phrases, such as "discipline," focusing on "value growth," "staying in line," or operating for "shareholder returns" to signal their continuing agreement to coordinate and restrain production of shale oil.

119.    In a competitive market for a valuable commodity, businesses tend to increase their production until the marginal cost of producing an additional unit of the commodity exceeds the market price.

120.    Here, with oil prices well above the break-even point, the supermajors and smaller independents acted in an economically rational manner, investing in shale drilling at significantly increased rates.

121.    Exxon, for example, planned to boost its 2022 production level in the Permian Basin by 25%, and Chevron planned a 10% increase in the same region.   In 2023, Exxon stated that by using new technologies, Exxon hoped to double the volume of oil produced from United States shale holdings over the next five years.

122.    Smaller independents also sought to expand production in the face of the advantageous economic environment.    "Smaller, privately held firms...raised production in response to higher prices and are going full steam ahead."[123]  The smaller producers "lead output gains during the highest [crude oil] prices in seven years."[124]

---

[122] *Id.*

[123] Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, REUTERS (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/.

[124] *Id.*

123.    Defendants had similar economic incentives to increase production. Under these circumstances, it would be against a Defendant's independent self-interest to restrain production, thereby allowing competitor to take market share.  But if Defendant is aware that no significant competitor will attempt to take market share, then they can restrain production without fear of economic loss.

124.    Individually, no United States shale oil producer had sufficient market power to meaningfully constrain United States shale oil output. However, Defendants collectively had substantial power in the United States market—particularly with respect to the swing production that affected global prices most significantly. Working together, Defendants could substantially constrain a sufficient portion of United States crude oil production that would impact the global price of oil and, as a result, they could exercise their power to negotiate cartel supply restrictions with OPEC.

125.    Thus, despite record prices in 2022 which remained elevated in 2023, Defendants continued to act against their economic self-interest and historical business practices by withholding production.

- In mid-February 2022, Defendant Pioneer's CEO Scott Sheffield again publicly supported the existence of an agreement among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line," and "I'm confident they will continue to stay in line."[125] Indeed, following the massive January-February 2022 price spike during which oil prices increased 20%, Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"[126]

---

[125] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-OilWill-Make-Shale-Giants-Drill-Aggressively.html.

[126] *Id.*

- The same week, other Defendants signaled their assent. During a Q4 earnings call, Defendant Continental's CEO Bill Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years . . . ."[127]

- On February 22, 2022, Defendant Diamondback's CEO Travis Stice explained, "we have no reason to put growth before returns . . . we will continue to be disciplined."[128]

- On February 24, 2022, Bloomberg reported that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers.... like [Defendant] Pioneer Natural Resources and [Defendant] Continental Resources[, who] are also limiting increases to less than 5% this year."[129]

- In March 2022, Defendant Occidental's CEO Vicki Hollub stated that Occidental had a "huge inventory of high-quality investments" available around the world, especially in United States shale, but was not acting on those opportunities to expand production, instead focused on maintaining high profits.[130]

---

[127] *Id.*

[128] Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[129] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[130] Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

- On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to "low single digits" in 2023, and it was "committed to remaining disciplined" despite economic conditions conducive to production increases.[131]

- In January 2023, Defendant Pioneer's Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."[132]

- In February 2023, Defendant Diamondback's CEO Travis Stice said, "we have no reason to put growth before returns...we will continue to be disciplined."[133]

- When asked in a March 2023 interview why Defendant Occidental was not using its profits to "drill more wells" and "bring down prices," its CEO, Vicki Hollub, responded that "prices are in a good place right now," "gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand and lower United States consumer gas prices, despite having the ability to profitably increase production.[134]

---

[131] EOG Resources (EOG), *Q2 2022 Earnings Call Tr.*, THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[132] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[133] Geert De Lombaerde, *Diamondback to keep production flat, invest $1.75 billion in 2022* OIL & GAS JOURNAL (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[134] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

126.    One energy industry analyst fittingly summarized the effects of Defendants'
output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating
> proportionally as oil prices were dialed up. That ability to respond quickly to the
> market was due to the speed at which shale wells could be developed: a few months
> compared to the years or decades of Big Oil projects. Today, shale is as responsive
> as in the past. But there's a difference. The dimmer appears to be capped at a certain
> level: No matter how high oil prices go above that level – say $100 a barrel – the
> industry will no longer add rigs to sop up market share. Rather, it will stay put and
> go into harvest mode with existing wells – that's exactly what happened in 2022,
> much to the consternation of the White House, which urged shale companies to drill
> more.[135]

127.    The irrationality of Defendants' actions was acknowledged by other industry
observers, who were flummoxed that Defendants refused to compete for market share in the face
of such favorable market conditions,[136]

---

[135] Blas, *supra* note 25.

[136] E.g., Press Release, *Continental Resources Announces Record 2021 Results; 2022
Projections Highlight Increasing Cash Flow and Corporate Returns, News Release (Exhibit
99.1)*, SEC ARCHIVES (Feb. 14, 2022),
https://www.sec.gov/Archives/edgar/data/732834/000119312522042827/d272362dex991.htm
(Defendant Continental reported that for 2022 it was "projecting an approximately $30 WTI free
cash flow breakeven price."); Centennial Resource Development Inc., *2022 Corporate
Sustainability Report*, PERMIAN RES.COM (2022), https://permianres.com/wp-
content/uploads/2022/08/Centennial-2022-Corporate-SustainabilityReport.pdf. ($32 breakeven
for Defendant Centennial); *Using Scenarios to Understand Risks, Opportunities*,
CHESAPEAKE ENERGY (2023), https://sustainability.chk.com/climate/portfolioresilience/
(Defendant Chesapeake breakeven between $33 and $42); *Investor Relations Presentation, May
2022*, HESS CORP. (May 2022), https://investors.hess.com/staticfiles/3814592c-05ea-4659-
9651-88012e29468f (Defendant Hess breakeven ~$45); *The Value Portfolio: Pioneer Natural
Resources is Heavily Undervalued*, SEEKING ALPHA (Aug. 9, 2023),
https://seekingalpha.com/article/4593056-pioneer-natural-resources-heavily-undervalued
(Defendant Pioneer breakeven $39); Irina Slav, *Running Out of Sweet Spots: Shale Growth May
Not Materialize*, MARKETS INSIDER (Feb. 7, 2022),
https://markets.businessinsider.com/news/stocks/running-out-of-sweet-spots-the-biggest-
problem-for-us-shale-1031168908 ("Technologically, oil and gas resources can be stretched to
near infinity as drilling technology advances further and further.").

- The Washington Post reported that the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[137]

- A February 2022 Bloomberg article wondered why Defendant EOG did not "take advantage of higher prices by pumping more crude from its shale fields."[138] The article noted that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[139]

- In March 2022, a CNBC anchor observed, "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[140]

- CNBC released a March 2023 article titled, "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO" even though Pioneer CEO Sheffield believed that the current prices were "the bottom" of future pricing.[141]

- On April 3, 2023, after OPEC made further production cuts, Bloomberg reported that the United States shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices despite

---

[137] Denning, *supra* note 18.

[138] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers

[139] *Id.*

[140] Stevens, *supra* note 123.

[141] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html

being "flush with cash after record profits."[142] According to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides," which "really puts a floor under the price of oil long term."[143]

128. Historically, Defendants had the ability to increase crude oil production and gain market share as swing producers, and often used this ability to take advantage of favorable market conditions. This practice, however, changed, and. Defendants no longer act as swing producers up to this day. As recently as April, 2024, Defendant Pioneer's CEO Sheffield extolling the industry's ability to withhold production: "Even if oil gets to $200/bl, the independent producers are going to be disciplined."[144]

129. Defendants' agreement to constrain United States shale oil production was a success. They continue to enjoy massive revenue increases, while not reinvesting that additional revenue into new production or otherwise increasing supply.

---

[142] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil

[143] *Id.*

[144] Shale Discipline even at $200/bl: Ex-Pioneer CEO (Apr. 16 2024) https://www.argusmedia.com/en/news-and-insights/latest-market-news/2558292-shale-discipline-even-at-200-bl-ex-pioneer-ceo.

**Figure 4. United States Shale Producer's Reinvestment Rate (capital expenditure as a percentage of operational cash flow)**



130.    Defendants are able to leverage their collective market share because of how fragmented the United States oil market is – of the almost 250 companies operating oil rigs in the United States, 162 companies run only a single rig.[145] Only 10 companies own 15 or more rigs – five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are supermajors (Exxon, Chevron, and ConocoPhillips).[146]

131.    When Defendants' production and capacity are combined with that of the OPEC and OPEC+ member countries, the resulting cartel formed by these entities controls

---

[145]Data obtained from Top Drilling Company – Oil Gas Leads (https://oilgasleds.com/top-drilling-company/ )

[146] Id.

approximately 60% of the total global oil production and nearly all total global oil production capable of quickly responding to sudden price variations on a short-term basis.

132.    Defendants' agreement by and between themselves and OPEC to coordinate United States shale oil production is *per se* illegal under the Sherman Act.

**H. Governmental Investigations into the United States Shale Oil Industry.**

      a.  **The FTC Issues an Order Banning Sheffield from Sitting on Exxon's Board of Directors due to Threat of Collusion.**

133.    On May 2, 2024, the Federal Trade Commission ("FTC") allowed Defendant Exxon Mobil's merger acquisition of Defendant Pioneer for $64.5 billion (the "Proposed Acquisition") to proceed, provided that Exxon agreed that Pioneer's former CEO Scott Sheffield would not serve as a director on Exxon Mobil's board and would not act as an advisor to Exxon Mobil.[147]

134.    The FTC's decision and order (the "Consent Order") notes that the FTC investigated the Proposed Acquisition and publicly released a draft complaint (the "Complaint"), providing a summary of the FTC's findings. If the Complaint was finalized and filed, the FTC indicated that it would charge Exxon Mobil with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.[148]

135.    The FTC indicated that it uncovered "voluminous evidence" that Sheffield made both public and private statements in a campaign to "organize anticompetitive coordinated output reductions between and among U.S. crude oil producers." By banning Sheffield from Exxon Mobil's board of directors, the FTC sought to prevent Sheffield from engaging in collusive activity that would potentially raise crude oil prices.[149]

---

[147] FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal, May 2, 2024, https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-order-bans-formerpioneer-ceo-exxon-board-seat-exxon-pioneer-deal  (attaching Consent Order and Complaint).
[148] *Id.*
[149] *Id.*

136.    The FTC concluded that "By giving Mr. Sheffield a larger platform from which to pursue his anticompetitive schemes—as well as decision-making input and access to competitively sensitive information of Exxon—the Proposed Acquisition violates Section 7 of the Clayton Act because it would meaningfully increase the likelihood of coordination and thereby harm competition, in the market for development, production, and sale of crude oil. Increases in crude oil prices are passed on to Americans through higher gasoline, diesel, heating oil, and jet fuel prices."[150]

137.    The FTC's investigation revealed Sheffield's statements about keeping U.S. oil output artificially low and detailed Sheffield's coordination with OPEC and OPEC+ to reduce the output of oil and gas, resulting in higher prices for consumers and inflated profits for Pioneer.[151]

138.    The FTC indicated that as far back as March 2017, Sheffield began attending meetings with OPEC, including a private dinner with the General Secretary of OPEC at the time, Mohammed Barkindo.[152]

139.    The communications with OPEC officials continued, and in 2020, during the early days of the COVID pandemic, the conversations focused on Sheffield limiting Permian Basin oil production since oil prices were falling globally.[153]

140.    Around the same time, the FTC found that Sheffield lobbied the Railroad Commission of Texas to impose output restrictions on oil production in the Permian Basin which would have reduced output and increased prices above market levels. Sheffield stated: "[i]f Texas leads the way, maybe we can get OPEC to cut production…I was using the tactics of OPEC+ to get a bigger OPEC+ done."[154]

---

[150] *Id.*
[151] *Id.* at 5.
[152] *Id.* at 6.
[153] *Id.*
[154] *Id.* at 5-6.

141.    Throughout the relevant period, the FTC found that Sheffield stayed in regular contact with representatives of OPEC, including the exchange of information on oil pricing and output and the facilitation of communications between OPEC and representatives of his competitors in the Permian Basin.[155]

142.    Further, the FTC indicated that Sheffield told competitors to "stay[] in line" and be "disciplined" about capacity growth, stating: (1) in 2021, that "[a]ll the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies;" and (2) in 2022, that "the public independents are staying in line…I'm confident they will continue to stay in line."[156]

143.    In 2023, the FTC indicated that Sheffield admitted that previous price competition had lowered prices for consumers but hurt shale investors and that the shale operators had to stay in-line because shale operators "produced too much oil and competed with OPEC…We actually lowered the price by $20 to $30 per barrel over the past 10 years to the detriment of losing our entire investor base."[157]

### b.    Senate Committee on the Budget Investigates the United States Shale Oil Industry.

144.    In June 2024, the Senate Committee on the Budget ("Senate Committee") initiated a probe in the suspected collusion between United States shale oil producers and OPEC, based in large part on the FTC's Decision and Order in the proposed merger of Exxon and Pioneer.[158]

145.    The Senate Committee sent letters to 18 oil producers, seeking information on whether "oil and gas companies could be engaging in collusive, anti-competitive activities with OPEC+ that would raise crude oil prices, resulting in higher costs...for American families."[159]  In

---

[155] *Id.* at 7.
[156] *Id.* at 5.
[157] *Id.*
[158] Mitchell Ferman, Leah Nylen, Jennfier A. Dlouhy, FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC - Bloomberg (July 19, 2024).
[159] See, e.g., 6.26.24 OPEC Collusion Letters-part-ExxonMobil.pdf (senate.gov) (letter to ExxonMobil Corporation).

particular, the Senate Committee sought communications from each oil producing company between itself and members of OPEC Secretariat or national representatives of OPEC countries "concerning oil production output, crude oil prices, and the relationship between the production and pricing of oil products, dating from January 1, 2020 through the present."[160]

### c. Other Government Requests for Information from United States Shale Oil Producers

146.    In July, 2024, ConocoPhilips received a second request from the U.S. Federal Trade Commission seeking information on its proposed acquisition of Marathon Oil.[161]   According to the Wall Street Journal, a "so-called second request by the FTC signals the agency is reviewing whether the union of the Houston companies could be anticompetitive under U.S. law."[162]

## PLUS FACTORS

147.    Defendants' and OPEC's statements demonstrate their coordination of production restraints.   In addition, there are numerous "plus factors" that tend to exclude the possibility that each Defendant acted independently.

148.    Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[163] "Super plus factors are actions or outcomes that would almost never be observed in the absence

---

[160] *Id.*

[161] ConocoPhillips, Marathon Oil get second US FTC request over $22.5 billion deal (July 12, 2024) https://www.reuters.com/markets/deals/conocophillips-marathon-oil-get-second-us-ftc-request-over-225-bln-deal-2024-07-12/

[162] Colin Kelleher, **FTC Seeks More Info on ConocoPhillips, Marathon Deal,** Wall Street Journal (July 12, 2024) https://www.wsj.com/business/ftc-seeks-more-info-on-conocophillips-marathon-deal-3312b4bc

[163] William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[164]

149.    The following plus factors alleged herein support an inference that Defendants' actions are the product of collusion and not pro-competitive, unilateral conduct.

150.    There is no doubt that the shale oil market is conducive to collusion regarding pricing levels.  OPEC, which controls the largest amount of crude oil production, has been doing that for decades.  There are no unique conditions in the United States shale oil market that would distinguish it from the international market. As discussed above, the United States shale oil industry is highly fragmented, with a small number of larger producers and hundreds of smaller producers. Defendants, as larger producers, have unused excess capacity.

151.    The market for shale oil production has high barriers to entry. The costs of drilling are prohibitive and the ongoing costs of maintaining drilling rigs are also large and ongoing, requiring constant investments in personnel, facilities, and machinery.   When a market is protected by high barriers to entry, conspirators can set artificially-inflated prices because the barriers to entry protect them against new competitors who would enter the market with a competitive price to obtain market share.

152.    Shale oil is a commodity, further facilitating price-fixing negotiations amongst would-be competitors. Accordingly, there are no reasonable substitutes and/or there are high switching costs, leading to highly inelastic demand, which means that purchasers' buying habits remain relatively unchanged in the face of change to the product's price, which enables producer cartels to extract monopoly rents from jet fuel purchasers who are unable to avoid price increases. Jet owners cannot operate their vehicles without jet fuel.  Furthermore, there is no cross-elasticity of demand for jet fuel, as no reasonable substitutes exist. Consequently, buyers will not be induced to buy more or less jet fuel through price changes.

---

[164] *See id.* at 426.

153.    Defendants had numerous and frequent opportunities to conspire during the Class Period.  Defendants regularly participate in industry trade associations, providing them with opportunities to collude, coordinate supply restraints and police cheating within the conspiracy. As detailed above, Defendants met during trade association gatherings, including annually at the CERAWeek Conference, to discuss their internal cooperation, forward-looking production plans, and the overall cooperation with OPEC by all Defendants to maintain that excess capacity. In addition to the public statements made by Defendants and OPEC, there were "private communications" between Pioneer's CEO, Scott Sheffield, and OPEC.[165]

154.    As discussed above, the FTC investigation into Exxon's proposed acquisition of Pioneer resulted in a proposed consent order that would Pioneer's CEO, Scott Sheffield, "from gaining a seat on Exxon's board of directors or serving in an advisory capacity at Exxon once it acquires Pioneer."[166]  In conjunction with the proposed Consent Order, the FTC filed a complaint that describes Sheffield's "history of attempting to coordinate with other oil industry participants"[167] which "suggests that the market here is susceptible to anticompetitive coordination."[168]  The FTC Complaint references the "voluminous evidence" of Sheffield's "efforts to organize tacit (and potentially express) coordination of capital investment discipline and oil production levels in the Permian Basin and across the United States"[169]

155.    Also as described above, Defendants' actions during the Class Period were against each Defendant's independent self-interest.  Defendants had strong incentives to increase shale oil production and capture market share but refused to do so.  No rational economic actor would forgo such opportunities for fear they would lose market share, unless they were part of

---

[165] FTC, FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal, (May 2, 2024) available at https://www.ftc.gov/news-events/news/press-releases/2024/05/ftcorder-bans-former-pioneer-ceo-exxon-board-seat-exxon-pioneer-deal.
[166] FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal, *supra* note 6.
[167] FTC Complaint at ¶ 19, *supra* note 7.
[168] *Id*
[169] *Id.* at ¶ 22.

an agreement with other producers to also constrain production and maintain crude oil prices at artificially high levels.

156.    Finally, and as also detailed above, Defendants repeatedly discussed with each other and OPEC representatives their confidential business plans, including forward-looking production and capacity information. Following these exchanges, Defendants then decided not to increase their respective production volumes when that would have been in their individual rational economic best interests, given rising prices. Defendants also repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement. Absent collusion, rational business would share this proprietary and competitively sensitive information with a direct competitor.

## ANTITRUST INJURY

### A.    Defendants' Conspiracy Inflated the Price of Crude Oil Throughout the Class Period.

157.    Historically, global crude oil demand was primarily met by oil obtained from conventional drilling. Following the Shale Revolution, the influence of United States shale production on crude oil prices (and Jet Fuel prices) is widely recognized by market analysts and economists. For example:

- In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, United States shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.[170]

- A Forbes article from 2019, claimed that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because,

---

[170] Irma Alonso Alvarez 7 Virginia Di Nino, *The oil market in the age of shale oil*, 8 ECB ECON. BULLETIN, 57-74 (2017).

since 2008, "U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."[171]

- In October 2019, the Executive Office of the United States President's Council of Economic Advisors declared that the United States Shale Revolution has "reduced the global price of oil by 10 percent" since 2007.[172]

- In 2020, economists from the Federal Reserve Bank of Dallas found that without the Shale Revolution, oil prices would have risen by 36% in 2018.[173]

- In 2023, an article in the International Journal of Energy Economics and Policy stated that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."[174]

158.   As noted above, Defendants exert power over crude oil prices as "swing producers" in the global crude oil market which gives their decisions on production a outsized impact on the price of crude oil.[175] Thus, Defendants have sufficient market power in a very fractured production landscape to dictate whether the United States can and will produce enough shale oil in response to high crude prices to "swing" the market and push prices down.

159.   Defendants have admitted that they have this power and can use it to affect pricing. In March 2022, the New York Times reported that "[e]xecutives of several companies,

---

[171] Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=249e989b5125.

[172] *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, COUNCIL OF ECON. ADVISORS (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[173] Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, FED. RESERVE BANK OF DALLAS (June 17, 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[174] Rodhan, *supra* note 28, at 433-43.

[175] Lee, *supra* note 26.

including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices . . . ."[176]

160.    Beginning at least as early as 2021, Defendants have collectively coordinated their production decisions, resulting in lower rates of production growth than would occurred in a competitive market, despite high oil prices and healthy global demand.

161.    Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total United States shale oil production. In 2022 alone, shale oil production in the United States increased by only 500,000 barrels, which was 50% short of market analysts' general yearly estimates.[177]

162.    The difference between the amount of shale oil that was actually produced in the United States and the amount of shale oil that would have been produced but for Defendants' conspiracy led to artificially inflated prices for crude oil, which caused Plaintiff and the members of the proposed Classes to pay higher prices for Jet Fuel than they otherwise would have (as discussed below).

**B.      Defendants' Agreement to Constrain Domestic Shale Oil Production Artificially Inflated the Prices Plaintiff and the Members of the Proposed Classes Paid for Jet Fuel.**

163.    Most Jet Fuel is supplied by United States refineries that send Jet Fuel to storage terminals for distribution to end-users.[178] Jet Fuel is generally transported by rail or barge to larger storage facilities, and then transported by truck to smaller storage tanks for sale to end-users.

---

[176] Stanley Reed, As Oil Soars, *OPEC and Its Allies Decline to Offer Relief*, The N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[177] Eric Rosenbaum, *Oil CEOs are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax*, CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

[178] *Jet Fuel: From Well to Wing* (Jan. 2018), https://airlines.org/wp-content/uploads/2018/01/jet-fuel-1.pdf/

164.    The cost of crude oil is a primary driver of the price of Jet Fuel, as crude oil is the primary raw material required for refinement of shale oil.[179]

165.    As demonstrated by Figure 12 below, prices paid by consumers for Jet Fuel closely mirror the prices for crude oil sold in the United States.

**Figure 12. Jet Fuel vs. Crude Oil Spot Prices**



166.    By way of example, the price for Jet Fuel, like the price for crude oil, increased significantly during the Class Period.  The price of Jet Fuel has increased by approximately 215% from January 2021 to July 2022.[180]

167.    Accordingly, the price of crude oil has a direct effect on the price of Jet Fuel. This is because crude oil is the primary raw material used to produce Jet Fuel sold throughout the United States. As a result, Defendants' conspiracy not only inflated the price of crude oil, it also inflated the price of Jet Fuel sold in the United States during the Class Period, which had a direct

---

[179] Alexander Mitchell, Airlines Confront Jet Fuel Uncertainty Amidst Conflicts And Environmental Push (April 15, 2024) https://simpleflying.com/airlines-jet-fuel-uncertainty-conflicts-environmental/

[180] Why Rising Fuel Prices Might Not Be As Bad For The Airline Sector At It Seems,  (July 15, 2022) https://www.mckinsey.com/industries/travel-logistics-and-infrastructure/our-insights/why-rising-fuel-prices-might-not-be-as-bad-for-the-airline-sector-as-it-seems

effect on Plaintiff and the members of the Classes who were forced to purchase Jet Fuel at these artificially inflated prices.

## **CLASS ACTION ALLEGATIONS**

168.     plaintiff brings this action as a class action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representatives of a class of indirect purchasers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

> All persons or entities who purchased Jet Fuel in the United States from January 1, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

169.     Plaintiff also bring this action as a class action on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class ("State Law Class"):

> All persons or entities who purchased Jet Fuel in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont from January 1, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

170.     The Nationwide Class and Damages Class are referred to collectively as the "Classes" and members of both classes are collectively referred to as "Class Members" unless otherwise indicated Specifically excluded from the Classes are Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from both Classes are any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

171.    The Class definitions provide clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Classes.

172.    Plaintiff reserve the right to modify these definitions and/or to propose subclasses, as appropriate, based on further investigation and discovery.

173.    **Numerosity**. The Class is so numerous that joinder of all members in this action is impracticable. There are thousands of geographically dispersed Class members.

174.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of from the point of sale. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the court.

175.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the Classes because they were all similarly affected by Defendants' unlawful conduct in that as a result Defendants' conspiracy to fix prices in the crude oil market, Plaintiff and the Class paid mor for Jet Fuel sold in the United States than they otherwise would have paid in the absence of Defendants' collusive conduct.

176.    **Adequacy**. Plaintiff will fairly and adequately protect the interests of the members of both Classes. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the interests of the Class members. Plaintiff is willing and able to assume the duties of a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

177.    **Common Questions of Law and Fact Predominate**. There are numerous questions of law and fact common to Plaintiff and members of the Classes, the answers to which will advance the resolution of the litigation as to all Class members and which predominate over any individual question. Plaintiff and both Classes were injured by the same unlawful price-fixing conspiracy, Defendants' anticompetitive conduct was generally applicable to all members

55

of the Classes, and relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

    i.      whether Defendants and their co-conspirators entered into a formal or informal agreement, combination, conspiracy, or common understanding to fix, raise, maintain, or stabilize the price of crude oil and/or Jet Fuel in the United States;

    ii.     the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    iii.    Whether such agreements constituted violations of the Sherman Antitrust Act;

    iv.    Whether such agreements constituted violations of the End-User Purchaser States' unfair competition, consumer protection and unjust enrichment laws;

    v.     The identity of the participants of the alleged conspiracy;

    vi.    whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and the other members of the Classes;

    vii.   whether Defendants caused Plaintiff and the members of the Classes to suffer damages in the form of overcharges on Jet Fuel;

    viii.  the effect of Defendants' conspiracy on the prices of Jet Fuel sold in the United States during the Class Period;

    ix.    the appropriate measure of class-wide damages for both Classes; and

    x.     the nature of appropriate injunctive relief to restore competition in the United States market for Jet Fuel.

178.    Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

179.    In cases like this one that allege price-fixing among competitors, the common question of law and fact regarding the existence of the alleged conspiracy by itself has been held to predominate over any possible individualized issues, thus warranting certification. The same holds true here.

180.    **Superiority**. Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the scores of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

181.    Plaintiff know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

182.    **Injunctive Relief**. Defendants have acted or refused to act on grounds generally applicable to the members of the Nationwide Injunctive Relief Class, making injunctive and corresponding declaratory relief appropriate with respect to this Class as a whole pursuant to Federal Rule of Civil Procedure, Rule 23(b)(2).

## CLAIMS FOR RELIEF

### A.      VIOLATION OF THE SHERMAN ACT

#### COUNT 1
#### VIOLATION OF 15 U.S.C. §1
#### (On Behalf of the Nationwide Injunctive Relief Class)

183.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

184.    From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize prices for crude oil and Jet Fuel in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

185.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil and Jet Fuel.

186.    The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

- Prices for crude oil sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

- Those who purchased Jet Fuel indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition, and paid artificially high prices for Jet Fuel.

187.    Plaintiff and members of the Nationwide Injunctive Relief Class have been injured and will continue to be injured in their businesses and property by paying more for Jet Fuel purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

188.    Plaintiff and members of the Nationwide Injunctive Relief Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**B.    VIOLATIONS OF STATE ANTITRUST, UNFAIR COMPETITION, AND CONSUMER PROTECTION LAWS**

189.    Plaintiff realleges and incorporates by reference all of the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates those allegations as if fully set forth therein.

190.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust, unfair competition, and consumer protection laws set forth below.

191.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiff and members of the Classes; exchanging competitively sensitive information between and among Defendants; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

192.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the State Law Class were deprived of free and open competition and paid more to

purchase Jet Fuel than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust, unfair competition, and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

193.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of, and to the detriment of, Plaintiff and the members of the Classes.

194.    Accordingly, Plaintiff and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

195.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust, unfair competition, and consumer protection statutes.

196.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 2: ALABAMA
### (On Behalf of Class Members that Purchased Jet Fuel in Alabama)

197.    Due to Defendants' unlawful conduct, (1) competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated within Alabama; (2) Jet Fuel prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiff and members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

## COUNTS 3 & 4: ARIZONA
### (On Behalf of Class Members that Purchased Jet Fuel in Arizona)

198.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout Arizona; (2) prices of Jet Fuel in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

199.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

200.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 5 & 6: CALIFORNIA
### (On Behalf of Class Members that Purchased Jet Fuel in California)

201.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout California; (2) Jet Fuel prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

202.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce. Each Defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert

of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of United States shale oil. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of Jet Fuel. As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiff and members of the Class seek treble damages and their costs of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

203.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 7 & 8: COLORADO
### (On Behalf of Class Members that Purchased Jet Fuel in Colorado)

204.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout Colorado; (2) Jet Fuel prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

205.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under Colo. Rev. Stat. §6-4101, *et seq.*

206.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 9: CONNECTICUT
### (On Behalf of Class Members that Purchased Jet Fuel in Connecticut)

207.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout Connecticut; (2) Jet Fuel prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under Conn. Gen. Stat. §3524 *et seq*.

## COUNTS 10 & 11: DISTRICT OF COLUMBIA
### (On Behalf of Class Members that Purchased Jet Fuel in District of Columbia)

208.     Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and purchased Jet Fuel in the District of Columbia, paid supracompetitive, artificially inflated prices for Jet Fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

209.     Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

210.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 12 & 13: FLORIDA
### (On Behalf of Class Members that Purchased Jet Fuel in Florida)

211.    Through their actions and actions of co-conspirators, crude oil and Jet Fuel prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class. Throughout the Class Period, competition in the Jet Fuel market was restrained, suppressed, and eliminated throughout Florida. Plaintiff and members of the Class, including those who purchased Jet Fuel in the State of Florida, paid supracompetitive, artificially inflated prices for Jet Fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

212.    Defendants have violated FLA. STAT. §542.15 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under FLA. STAT. §542.15 *et seq*.

213.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 14: HAWAII
### (On Behalf of Class Members that Purchased Jet Fuel in Hawaii)

214.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions. *See* HAW. REV. STAT. §§480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, Jet Fuel prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiff and members of the Class, including those who resided in the State of Hawaii and purchased Jet Fuel in Hawaii, paid supracompetitive,

artificially inflated prices for their Jet Fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiff and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

### COUNTS 15 & 16: ILLINOIS
### (On Behalf of Class Members that Purchased Jet Fuel in Illinois)

215.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil and Jet Fuel market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

216.    Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

217.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

### COUNT 17: IOWA
### (On Behalf of Class Members that Purchased Jet Fuel in Iowa)

218.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Jet Fuel prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

## COUNT 18: KANSAS
### (On Behalf of Class Members that Purchased Jet Fuel in Kansas)

219.   Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Jet Fuel prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

## COUNT 19: MAINE
### (On Behalf of Class Members that Purchased Jet Fuel in Maine)

220.   Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Jet Fuel prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

## COUNTS 20 & 21: MARYLAND
### (On Behalf of Class Members that Purchased Jet Fuel in Maryland)

221.   Defendants' combinations or conspiracies detrimentally affected price competition in the State of Maryland for crude oil and Jet Fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Jet Fuel prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

222.    Defendants violated MD. CODE ANN., COM. LAW §11-201 *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiff and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq.*

223.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 22: MASSACUSETTS
**(On Behalf of Class Members that Purchased Jet Fuel in Massachusetts)**

224.    Defendants' combinations or conspiracies detrimentally affected price competition in the State of Massachusetts for crude oil and Jet Fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Jet Fuel prices in the State of Massachusetts at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

225.    Defendants violated Mass. G.L. c. 93A, *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of Massachusetts. Accordingly, Plaintiff and members of the Class seek all relief available under Mass. G.L. c. 93A, *et seq.*

226.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Defendants because, upon information and belief, Defendants have not identified a place of business or assets within Massachusetts.

### COUNTS 23 & 24: MICHIGAN
**(On Behalf of Class Members that Purchased Jet Fuel in Michigan)**

227.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

229.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 25 & 26: MINNESOTA
### (On Behalf of Class Members that Purchased Jet Fuel in Minnesota)

230.    Through their actions and the actions of their co-conspirators, Jet Fuel prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiff and members of the Class, including those who resided in the State of Minnesota and purchased Jet Fuel there, paid supracompetitive, artificially inflated prices for Jet Fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

231.    Defendants have violated MINN. STAT. §325D.49 *et seq*., through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

232.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. Minn. Stat. §325d.43-48 *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

**COUNT 27: MISSISSIPPI**
**(On Behalf of Class Members that Purchased Jet Fuel in Mississippi)**

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq*. *See* Miss. Code Ann. §75-57-63. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, Plaintiff and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-5763.

**COUNTS 28 & 29: NEBRASKA**
**(On Behalf of Class Members that Purchased Jet Fuel in Nebraska)**

234.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

235.    Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

236.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

**COUNTS 30 & 31: NEVADA**
**(On Behalf of Class Members that Purchased Jet Fuel in Nevada)**

237.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Jet Fuel prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

238.    Defendants violated Nev. Rev. Stat. Ann. §598A.210 *et seq*., by entering into an unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq*., Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

239.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

**COUNTS 32 & 33: NEW HAMPSHIRE**
**(On Behalf of Class Members that Purchased Jet Fuel in New Hampshire)**

240.    Defendants' combinations or conspiracies detrimentally affected price competition in the State of New Hampshire for crude oil and Jet Fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Jet Fuel prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

242.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 34 & 35: NEW MEXICO
### (On Behalf of Class Members that Purchased Jet Fuel in New Mexico)

243.   Defendants' combinations or conspiracies detrimentally affected price competition in the State of New Mexico for crude oil and Jet Fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Jet Fuel prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

244.   Defendants violated N.M. STAT. ANN. §57-1-1 *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiff and members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

245.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 36: NEW YORK
### (On Behalf of Class Members that Purchased Jet Fuel in New York)

246.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of New York, and (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New York. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

## COUNT 37: NORTH CAROLINA
### (On Behalf of Class Members that Purchased Jet Fuel in North Carolina)

247.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) Jet Fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Carolina. Accordingly, Plaintiff and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq*.

## COUNT 38: NORTH DAKOTA
### (On Behalf of Class Members that Purchased Jet Fuel in North Dakota)

248.    Defendants' actions have violated N.D. CENT. CODE §51-08.1-01 *et seq*. through their anticompetitive actions. Through their actions and the actions of co-conspirators, Jet Fuel prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiff and members of the Class, including those who resided in the State of North Dakota and purchased Jet Fuel there, paid supracompetitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota. Accordingly, Plaintiff and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq*.

## COUNTS 39 & 40: OREGON
### (On Behalf of Class Members that Purchased Jet Fuel in Oregon)

249.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Jet Fuel prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open

competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Oregon.

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq*.

251.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 41 & 42: RHODE ISLAND
### (On Behalf of Class Members that Purchased Jet Fuel in Rhode Island)

252.    Defendants' combinations or conspiracies detrimentally affected price competition in the State of Rhode Island for crude oil and Jet Fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Jet Fuel prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

254.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 43 & 44: SOUTH DAKOTA
### (On Behalf of Class Members that Purchased Jet Fuel in South Dakota)

255.    Through Defendants' actions and the actions of their co-conspirators, Jet Fuel prices in the State of South Dakota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition

in the market for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiff and members of the Class, including those who resided in the State of South Dakota and purchased Jet Fuel there, paid supracompetitive, artificially inflated prices for their Jet Fuel.

256.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq.*

257.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 45: TENNESSEE
### (On Behalf of Class Members that Purchased Jet Fuel in Tennessee)

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of Jet Fuel, a tangible good, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Jet Fuel, a tangible good, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiff and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq.*

## COUNT 46: UTAH
### (On Behalf of Class Members that Purchased Jet Fuel in Utah)

259.    Defendants violated UTAH CODE ANN. §76-10-3101 *et seq.* by entering into unlawful agreements in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected price competition in the State of Utah for

crude oil and Jet Fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Jet Fuel prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiff and members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq*.

## COUNT 47: VERMONT
### (On Behalf of Class Members that Purchased Jet Fuel in Vermont)

260.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Jet Fuel was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Jet Fuel prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiff and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Classes, respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23, appoint Plaintiff as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes, once certified;

B.    The Court adjudge and decree that the acts of Defendants, as set forth above, are illegal and unlawful, and constitute a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust, unfair competition, and consumer protection laws as alleged above;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Classes for treble the amount of damages sustained by Plaintiff and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.     The Court award Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: August 22, 2024                    Respectfully submitted,

                                         /s/ *Justin R. Kaufman*
                                         Justin R. Kaufman
                                         Rosalind B. Bienvenu
                                         DURHAM, PITTARD & SPALDING, L.L.P.
                                         505 Cerrillos Rd Suite A209
                                         Santa Fe, New Mexico 87501
                                         505.986.0600 phone
                                         505.986.0632 fax
                                         jkaufman@dpslawgroup.com
                                         rbienvenu@dpslawgroup.com

Garrett D. Blanchfield (*pro hac vice forthcoming*)
Brant D. Penney (*pro hac vice forthcoming*
Roberta A. Yard (*pro hac vice forthcoming*)
**REINHARDT WENDORF & BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN  55402
Tel:  (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

David M. Wilkerson (*pro hac vice forthcoming*)
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
dwilkerson@vwlawfirm.com

*Counsel for Plaintiff and the Proposed Classes*